SCHUYLKILL TRANSP. CO. (PUBLIC SERVICE ELECTRIC & GAS CO., Intervener) v. BANKS et al.

PUBLIC SERVICE ELECTRIC & GAS CO. v. DELAWARE RIVER LIGHTERAGE CO. et al.

THE COAL BARGE NO. 563.
THE GRACE ANN.
No. 8825, 8871.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 2, 1945.
Decided Nov. 27, 1945.

Howard M. Long, of Philadelphia, Pa., for Charles T. Banks.

George E. Beechwood, of Philadelphia, Pa. (Conlen, LaBrum & Beechwood, of Philadelphia, Pa., and Bigham, Englar, Jones & Houston and Charles A. Van Hagen, Jr., all of New York City on the brief), for Public Service Electric & Gas Co.

Samuel B. Fortenbaugh, Jr., of Philadelphia, Pa. (William K. Given, Jr., and Shields, Clark, Brown & McCown, all of Philadelphia, Pa., on the brief), for appellees.

Before ALBERT LEE STEPHENS, MARIS, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

Early in the morning on April 19, 1943, the barges "563" and "574" belonging to Schuylkill Transportation Company lay at Pier 18, Philadelphia, loaded with cargoes of coal belonging to the Public Service Electric and Gas Company. The "563" and "574" were wooden barges. The "563" was 110 feet long, 32 feet wide and 17 feet deep, with a square bow and stern and an open hatch with coamings 3 feet 6 inches high around the sides of the hatch. The "574" was of substantially the same size and build. The cargoes of coal were urgently needed by Public Service at its power plant at Burlington, New Jersey. The president of Schuylkill Transportation Company, Thomas J. Donnelly, accordingly orally arranged with Charles T. Banks, who with his wife owns the tugboat "Grace Ann," to tow the two barges to Burlington. It was a rainy

day and there was an easterly wind of a velocity in excess of 25 miles per hour. Banks raised the question with Donnelly as to whether the barges were fit and seaworthy and properly loaded with sufficient freeboard for the voyage in such weather but was assured that they were, that others had taken them on the same voyage in any kind of weather and that it was absolutely necessary for the barges to go because their cargoes were badly needed. Donnelly also stated to Banks that his marine superintendent, Captain Mohan, had seen the barges that morning and that they were loaded so as to have at least two feet freeboard.

Later in the morning the "Grace Ann" took the two barges in tow and proceeded up the Delaware River with them. The "574" was first in the tow and the "563" followed, being fastened close to her stern with two short lines. Each barge had a master aboard her. The tide was flooding and being in opposition to the wind it made the river rough and choppy. The barges at once began to take a good deal of spray over their bows and to ship water so that it became necessary to operate the pumps on each. The "574" was loaded with coarse coal and the water which she shipped ran readily through her cargo into the bilges where it could be pumped out. In the case of the "563", however, which was loaded with fine coal, the water which was shipped tended to lie on top of her cargo and to cause her to list and lose freeboard. Moreover, while her hull was staunch, her decks and particularly her hatch coamings were so rotten and defective in many places that she shipped an excessive amount of the water which was taken over her decks. The result was that from the very start of the voyage she was in difficulty, gradually taking in more water and losing freeboard. After she had passed the Koppers Coke Company plant about four miles up the river she began to list noticeably. These conditions gradually grew worse as the voyage continued.

About 300 yards above the Tacony-Palmyra bridge the channel of the Delaware River makes a turn of about one and one-half points to the eastward. When the tow reached this point and the change of course was made the "563" got into more serious trouble. Her list increased, she swung sideways, the river came over her, and she capsized and sank. In order to save the "574" the masters of the two barges cut the lines between them just before the "563"

sank. No distress signals, however, nor any request for assistance were given to the captain of the tugboat by the master of either barge prior to the sinking of the "563." After the sinking the master of the "574" requested the tugboat captain to proceed to Burlington which he did and the "574" was delivered there safely.

The Schuylkill Transportation Company subsequently filed its libel against the "Grace Ann" and her owners to recover the damage to the "563," which had later been raised. The Public Service Electric and Gas Company, owner of the cargo of coal, intervened in that case to recover for the loss of the coal. It also filed a libel of its own against the "563," its owner, the Schuylkill Transportation Company, and the Delaware River Lighterage Company which had contracted to carry the coal. The two suits were heard together by the district court, which decided that the catastrophe was the result of the negligence of the master of the "Grace Ann" in continuing with the voyage past the Tacony-Palmyra bridge in the face of the existing conditions of wind and weather. The court absolved the "563" of the charge that it was unseaworthy for the voyage to which it was committed by its owner and entered a decree that the "Grace Ann" and her owners are liable to the Schuylkill Transportation Company for the damage to the "563" and to Public Service Electric and Gas company for the loss of her cargo. The libel filed by the latter company against the barge was dismissed. Thereupon the owners of the "Grace Ann" and Public Service Electric and Gas Company each appealed.

The decrees appealed from must each be reversed. Upon the facts above recited, which are abundantly established by the evidence, we think it must be concluded that the sinking of the "563" was the direct result of her physical unseaworthiness, under the conditions of wind and weather existing in the Delaware river on April 19, 1943, to make the voyage to which her owner committed her on that day. With knowledge of the weather, Donnelly, president of Schuylkill Transportation Company, requested Banks to undertake the tow and assured him that the "563" was fit and properly loaded for the voyage that day. If this had been true we do not believe that she would have suddenly capsized and sunk as she did. That occurrence, however, is explained when we recall that the decks and hatch coamings of the "563" were far

from watertight so that in the weather which she encountered she was certain to ship large quantities of water; that the rather impervious character of the cargo with which she was loaded prevented that water from passing readily into the bilges where it could be pumped out, and that as a result she was gradually sinking and in addition was acquiring an ever increasing list.

It is entirely understandable that after eight or nine miles of such a voyage the barge had so far sunk in the water and listed that when upon her change in course she met with extra heavy seas they overcame her lessened freeboard and caused her to turn over sideways and sink. This explanation of the occurrence is also supported by the fact that the "574" which was subjected to exactly the same conditions of wind, weather and sea, but was loaded with a cargo which permitted her to be pumped out more effectively, made the voyage in safety to Burlington.

■■ What has been said demonstrates that the master of the "Grace Ann" was not guilty of negligence in continuing the voyage past the Tacony-Palmyra bridge. Aside from the fact that there was nothing else for him to do after he had passed the last available dock at the Koppers Coke Company, the safe voyage of the "574" indicates that his action was not imprudent. Moreover he received no warning of the increasingly unseaworthy condition of the "563" from her master, who gave him no report or signal of any kind up to the very moment that he cut her adrift. Under the circumstances the captain of the "Grace Ann" was entitled to rely upon the representations of Donnelly to Banks that the "563" was seaworthy for the voyage to which she had been committed. The Edmund L.Levy, 2 Cir., 1904, 128 F. 683; Dameron-White Co. v. Angola Transfer Co., 5 Cir., 1927, 19 F.2d 12; Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47; The Mariner, D.C. Mass. 1940, 35 F. Supp. 802; The Rondout, D.C.E.D.N.Y.

1944, 53 F. Supp. 736. It follows that the libel of Schuylkill Transportation Company should have been dismissed.

■■ Turning to the libel filed by Public Service Electric and Gas Company against the "563," her owner, Schuylkill Transportation Company, and Delaware Lighterage Company, we find it to be admitted that a contract of carriage was entered into between these two latter companies, through their agent the master of the "563," for the carriage of the cargo of coal from Philadelphia to Burlington by the barge "563." The coal was lost in the sinking of the "563." While it is agreed that in this transaction the respondents were acting as private carriers and were, therefore, not insurers, they were obligated to exercise due care for the protection of the cargo (Commercial Corp. v. New York Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89) and to provide a seaworthy vessel fit to perform the voyage which had been undertaken. Luckenbach v. McCahan Sugar Co., 1918, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522; The Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Carib Prince, 1898, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181; The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Federal Forwarding Co. v. Lanasa, 4 Cir., 1929, 32 F.2d 154. The respondents failed in this duty for, as we have seen, the "563" was not physically fit for the voyage to which she was committed under the weather conditions existing at the time. It follows that the "563" and the respondents are liable to Public Service Electric and Gas Company for the loss of the cargo and that the libel of the latter should not have been dismissed.

The decrees of the district court are reversed and the causes are remanded with directions to dismiss the libel in No. 8825 and to reinstate the libel in No. 8871 and thereupon to enter an appropriate decree in conformity with this opinion.