**ROYSTON DISTRIBUTORS, INC.**

v.

**MOORE–McCORMACK LINES, INC.**

**IMPERIAL CAR DISTRIBUTORS, INC.**

v.

**MOORE–McCORMACK LINES, INC.**

**Nos. 171 and 399 of 1960.**

United States District Court
E. D. Pennsylvania.

June 4, 1965.

John B. H. Carter and Peter Hearn, Philadelphia, Pa., for libellants, Royston and Imperial.

H. Wallace Roberts, Philadelphia, Pa., for respondent, Moore-McCormack Lines.

VAN DUSEN, District Judge.

These actions claim recovery under The Carriage of Goods by Sea Act, 46 U.S.C. § 1301ff., for damage to British-made automobiles while being transported in an uncrated condition on respondent's ships from England to Philadelphia, Pa. The following excerpts from the statement of facts in respondent's brief (Document 50) summarize the basic facts developed by the evidence at the trial:

"These admiralty cases, consolidated for the purposes of trial, were tried by this Court. The libelants, Royston Distributors, Inc. (Royston Distributors) and Imperial Car Distributors, Inc. (Imperial), are distributors of certain automobiles manufactured by British Motor Corporation (BMC). The respondent is a steamship company which carried a number of these automobiles during the year 1959 from London to Philadelphia. It is alleged that certain automobiles carried by respondent were damaged during transit. Libelants are suing respondent for this alleged damage under a purported assignment from the admitted consignee of the cargo, Hambro Automotive Corporation (Hambro). The Royston Distributors suit (No. 171 of 1960, In Admiralty) contains six Counts covering alleged damage to cars on six of the seven voyages; the Imperial suit (No. 399 of 1960, In Admiralty) contains two Counts covering the seventh voyage and claim for damage under two bills of lading on the sixth voyage.

"Below is a summary showing the vessel, voyage number, bill of lading number and date, and number of automobiles covered by each bill of lading. This information is arranged by Count

number of the Libels ('R–1' refers to Count #1 of Royston Distributors' Libel; 'I–1' refers to Count #1 of Imperial's Libel; etc.).

| Count | Ship | Voyage | B/L # and date | | Cars covered |
|---|---|---|---|---|---|
| R–1 | MORMACWIND | 9W | #3 | 3/3/59 | 28 |
| | | | #4 | | 80 |
| R–2 | MORMACPENN | 66W | #1 | 5/20/59 | 245 |
| R–3 | ROBIN LOCKSLEY | 9W | #5 | 6/5/59 | 50 |
| | | | #7 | | 63 |
| R–4 | MORMACSAGA | 65W | #2 | 6/13/59 | 50 |
| | | | #3 | | 69 |
| R–5 | MORMACPENN | 67W | #10 | 7/13/59 | 65 |
| R–6 | MORMACWIND | 13W | #3 | 10/30/59 | 59 |
| I–1 | MORMACWIND | 13W | #4 | 10/30/59 | 75 |
| | | | #6 | | 5 |
| I–2 | MORMACWIND | 14W | #7 | 12/24/59 | 2 |
| | | | #8 | | 31 |
| | | | #9 | | 73 |

\* \* \* \* \* \*

"Royston Distributors and Imperial are the sole distributors for BMC in a six state wide area, including Pennsylvania. Both corporations are obstensibly controlled and operated by their president, Mr. Royston. The libelant corporations are set up so that Royston Distributors purchases and sells to its local franchise dealers the Austin and Austin-Healey lines of BMC automobiles, while Imperial handles the MG and Morris lines. Royston Distributors and Imperial derive their exclusive rights through written franchise agreements with Hambro, the United States sales concessionairre of BMC in all fifty states.

"Royston Distributors has now and had during 1959 several subsidiary corporations involved in the automobile business and connected with the claims in these actions: Royston Auto Supply, Inc. (Auto Supply), which purchased BMC auto parts, etc. for resale to dealers of Royston Distributors and Imperial; Royston Body Shop, Inc. (Body Shop), which operated an automobile body shop and repaired transit damage until it was closed on September 25, 1959; and Royston Auto Service, Inc. (Auto Service), which operated a service shop where mechanical difficulties were corrected and other repairs (with the exception of body work) were made. Royston Distributors, Imperial and each subsidiary corporation maintained complete and separate records and corporate journals. \* \* \*

"To supply cars to their dealers, Royston Distributors and Imperial placed orders with Hambro and Hambro arranged to have the cars shipped from BMC in London to Philadelphia. Royston Distributors and/or Imperial took delivery from Hambro at the docks in Philadelphia in accordance with their franchise agreements. Between March 3, 1959 and December 24, 1959 respondent carried unboxed automobiles from London to Philadelphia on seven voyages shown above. All of these shipments were made by Nuffield Exports, Ltd. or Austin Motor Exports Corporation, Ltd. (both sales subsidiaries of BMC) to Hambro. \* \* \* The automobiles \* \* \* were consigned to Hambro under each bill of lading (CR–1A through CI–2A). The cars were purchased from Hambro by the libelant corporations who took title to the cars for resale to dealers.

This same general procedure had been followed by libelants for the years prior to 1959.

"When a shipment of cars destined for libelants through their franchise agreements with Hambro arrived at the docks in Philadelphia, libelants would send Larry Smith and a crew of men down to the piers. The crew would put gas in the automobiles, take delivery and drive them away. At the time of delivery, Larry Smith made written notes of the condition of each car and exceptions for this damage was noted in respondent's delivery book.[1] These notes, hereinafter referred to as the 'Smith Survey' (CR–1B through CI–2B), show damage notations, by car serial number, under three major categories (scratches, chips and dents) and also the general location of each type of damage. For example: 'scratch, left rear fender', 'chip, right front fender', 'dent, hood', etc. There is no way to determine from the Smith Surveys the length or depth of a scratch, the depth or size of a chip, the severity of a dent, or their approximate locations on a particular panel.[2]

"Upon completion, the Smith Survey was turned into the Royston Organization office and claims based on this report were typed up, reviewed by Mrs. Royston (N.T. p. 128), signed by Mr. Royston and lodged with Hambro or the steamship company (N.T. p. 117). For the purpose of preparing claims, it was assumed that all chips and scratches required refinishing of the entire panel where located and all dents required straightening and refinishing of the entire panel where located (N.T. p. 141, 142). A schedule of charges for repair work (L.Misc. 5), admittedly not based on the cost experience of the Royston Organization (N.T. p. 163), was used in determining the amounts claimed for repairing each scratch, chip or dent. This schedule was used by libelants from late 1956 up to the present time for the purpose of making transit damage claims, * * * (N.T. p. 149).

"Following delivery at the pier, the automobiles were placed in temporary storage, then processed through the Royston Organization before being shipped out to dealers. The cars were washed, mechanical defects repaired, and oftentimes body repair work performed. Determination of whether a car would go into the Body Shop was made by supervisory personnel (not Larry Smith) after the car was washed; the decision was in no way related to the Smith Survey (N.T. p. 309). Each corporate subsidiary (Auto Parts,

---

1. Paragraphs 2 and 3 of respondent's answers to libellants' interrogatories admit that the automobiles at the time of delivery in Philadelphia were "substantially as noted by libellants' exceptions taken at delivery." N.T. 9–10. See, also, paragraph 4 of the Stipulation of 12/3/64 (Document 42). These exceptions taken at delivery refer to the damage noted on the "Smith Survey" (also called pier survey reports).

2. Mr. Smith listed his damage by a series of abbreviations (N.T. 41). A scratch—"SCR"—was a "cut into the paint surface" which could be either "to the primer underneath or down to the metal," (N.T. 41, 42, 67, 68, 73 and 79). He did not note a scratch unless rubbing it with a fingernail exposed a broken surface of the paint (N.T. 42). A dent was "a depression in the metal, any depth, so that the metal has been stretched out of shape" (N.T. 42, 72, 73 and 94). A crease was "a long straight line" (N.T. 42). A chip was "a small round or jagged edge where the paint has been removed either to the primer or to the metal surface" (N.T. 42, 76, 77–8 and 85). A "buckle" was "where the contour of the edge of the fender has been disturbed" (N.T. 44, 70–1). The location of the damage was sometimes noted on the pier survey reports (N.T. 43). For example, a right front fender was designated "RFF" (N.T. 43). Each of the pier survey reports was signed by the agent of respondent who accompanied Mr. Smith during his inspection and by Mr. Smith (N.T. 46–52). Libellants cannot locate the pier survey reports for the second count of the Imperial claim (No. 399 of 1960). However, counsel for respondent has admitted that such a survey was made and that the transit damage claims for that count (CI–1C) were based upon a pier survey report substantially identical to those introduced into evidence in all other counts.

Auto Service and Body Shop) kept accurate records on each and every car processed, including work performed, time expended and charges made. On [some] occasions, outside commercial body shops were used. Additionally, some of the cars were sold to dealers (without any price reduction) who would themselves make necessary repairs. The Body Shop billed libelants for the repair work which it performed (based upon its records as to the actual work performed and time spent); outside body shops submitted bills for their work; dealers submitted written claims for their repairs; and libelants made payments as they saw fit for repairs to each of the above. * * *

"Prior to March 3, 1959, claims for damages existing on the cars purchased by libelants from Hambro were made directly against Hambro. The pre-March, 1959 claims are said by libelants to be identical in form and content to those claims asserted against the respondent. These claims were then presumably referred to Hambro's insurance company and adjustments made. Following a mandatory change in the terms of Hambro's policy of insurance which had prior to March 3, 1959 provided full coverage against all transit damages, there was a mutual understanding that Hambro would not be liable for transit damage no longer covered by insurance, (Birt Deposition p. 64–66). Hambro assigned to libelants the right to make claims against various steamship companies for transit damage not covered under the terms of Hambro's insurance policy (L.Misc. 14 and 14A). * * *

" * * * Libelants' body shop (Body Shop) ceased operations on September 25, 1959. Prior to this date, the Body Shop performed full and complete body repairs to many of the cars purchased by libelants. After the Body Shop closed on September 25, 1959, libelants instituted the practice of shipping * * * cars directly to dealers without any body repairs being made to the cars, and of granting the dealers an allowance of $20 per car, termed the 'flat rate', to compensate the dealers * * * for body repair work."

## I.   Liability

■ By showing delivery of the cars described in the bills of lading in damaged condition (see pages 2–6 of libelants' brief, being Document 49), libelants made out a prima facie case of liability on respondent to pay for the damage shown in the Smith Survey and respondent did not come forward with evidence to rebut this prima facie case.

## II.   Right of libellants to recover for damage to the cars in transit on this record

The rights of libellants to recover against respondent for transit damages are derived from an assignment by Hambro (consignee under the bills of lading) of its rights against respondent. The Mandu, 102 F.2d 459 (2nd Cir. 1939). The first assignment (L.Misc. 16) was executed on June 6, 1960, by the president of Hambro and applied only to a specific shipment of automobiles. Under this document, Hambro assigned all claims and causes of action against respondent for transit damage without limitation.

On November 6, 1961, second and third assignments were executed by the president of Hambro and Mr. Royston (Exhibit L.Misc. 14 was granted to Royston Distributors and applies to the claims in No. 171 of 1960; Exhibit L.Misc. 14A was granted to Imperial and applies to the claims in No. 399 of 1960). Both of these assignments are entitled "Master Assignment" and are identical in terms. They will be referred to jointly in this opinion as the "Master Assignment." This Master Assignment covered all shipments between March 1959 and March 6, 1961, and provided as follows:

" * * * Hambro, for value received and intending to be legally bound, hereby assigns and transfers to Imperial, its successors and assigns, to have and to hold forever, all its right, title and interest in and under all Bills of Lading for automobiles purchased

from Hambro and paid for in full by Imperial, since March 1959 to the date hereof, including but not limited to all demands, claims and causes of action thereunder against the owners, operators and vessels named in said Bills of Lading for damages to the automobiles described in the respective applicable Bills of Lading with rights thereunder to sue for and collect damages for the use of Imperial;

"PROVIDED, however, that there are excepted from the foregoing assignment and transfer all such demands, claims and causes of action on account of any such damages that were covered by insurance to the extent of the insurance coverage."

Respondent makes the argument that because the first specific assignment (L. Misc. 16) is inconsistent with the proviso regarding insurance quoted above in the later Master Assignment, the Master Assignment must control. However, libellants concede that the proviso in the Master Assignment governs all claims for damages after March 1959,[3] so it is not necessary to rule on respondent's contention on this point.

Respondent acknowledges the validity of the Master Assignment but contends that libellants have failed to establish their rights with respect to their claims derived from it. Because of the proviso contained in the Master Assignment assigning all rights of libellants against respondent for transit damage, except those "demands, claims and causes of action on account of any such damages that were covered by insurance to the extent of the insurance coverage," respondent contends that libellants must establish the extent of insurance coverage in order to perfect their claims in these cases. This, respondent claims, the libellants have failed to do.[4] There was some evidence to the effect that the insurance policy covered all claims in excess of $100. per unit (Birt Deposition, p. 76; N.T. 128), and counsel for libellants affirms those statements at footnote 4 on page 10 of Document 49. However, the actual policy was never produced.[5]

3. Fn. 4, p. 10 of Libellants' Brief in Support of a General Verdict in Their Favor For the Full Amount Claimed (Document 49).

4. At pages 24–25 of Respondent's Brief Sur Pleadings and Proof (Document 50) the following appears:

"* * * it is clear that the Master Assignment (L.Misc. 14 and L.Misc. 14A) is the only existing, legally enforceable assignment, and the sole documents which establish, determine and control libelants' standing in this case and the extent of libelants' rights against respondent.

"The Master Assignment is a clear and unambiguous document. It assigns to libelants Hambro's rights under the bills of lading to claim against respondent for damage allegedly sustained to certain cargo during ocean transit, except those 'demands, claims and causes of action on account of any such damages that were covered by insurance, to the extent of insurance coverage.' And to define the rights assigned therefore, it is necessary to first determine the 'extent of insurance coverage.'

"The policy of insurance referred to in the Master Assignment was available to libelants and could have been introduced at trial; testimony was available to libelants to show the type and extent of insurance coverage. Libelants however failed to produce such evidence. Libelants have, therefore, failed to establish their rights with respect to the present claims or their standing against respondent in these consolidated cases. Had libelants produced testimony or documentary evidence in this regard, it is respondent's contention that such evidence alone would greatly reduce libelants' present claim."

5. Even after reduction of labor costs claimed by libellants to 35% of such claims, a few of the claims, such as those relating to Car No. 15692 on page 20 of CR–2C and Car No. 15023 on page 22 of CR–2C, appear to exceed the $100. ceiling. See page 287 of Document 31 in No. 141 of 1960 for testimony of Miss Thomas that the insurance only covered damage in excess of $100. Cases such as Feeley v. United States, 337 F.2d 924 (3rd Cir. 1964), are inapplicable since the proviso quoted at page 7 above limits the right of libellants to recover for transit damages as a matter of contract.

■ In view of these facts, judgment will not be entered for ten days so that respondent may have the opportunity to demand in writing a further hearing, at which time libellants would have the opportunity to produce the insurance policy in support of their claims under the Master Assignment. The admiralty cases make clear that libellants should be given an opportunity to show their right to recover even after trial. The Speybank, 28 F.2d 436, 437 (D.C.Md.1928); cf. Compagnie De Navigation, etc. v. Mondial United Corp., 316 F.2d 163, 171–172 (5th Cir. 1963).

It is not necessary at this time to go into a discussion of what rights might have been secured by libellants by negotiation of the bills of lading because libellants have apparently acquired sufficient rights to bring this suit under the Master Assignment (L.Misc. 14 and 14A). If the insurance policy is not produced or if evidence is produced at the hearing mentioned above that renders the Master Assignment ineffective, the court will then consider the negotiation of the bills of lading. It seems appropriate to point out at this point that the cases cited by libellants on this point at pages 9 and 10 of libellants' Brief in Support of a General Verdict in Their Favor For the Full Amount Claimed (Document 49) are inapplicable because there has been no showing of endorsement and delivery of the bills of lading from Hambro, the admitted consignee, to libellants.

### III.   Damages

Libellants contend that they are entitled to have their damages computed on the basis of applying the schedule of charges (L.Misc. 5) which their expert (Mr. Sees) testified were reasonable for the Philadelphia area in 1959 to the list of damages to the cars made upon arrival of the cargo in Philadelphia and jointly approved by representatives of both parties (CR–1A to CR–6A, CI–1A and CI–2A). This computation is contained in the transit damage claims (CR–1C to CR–6C, CI–1C and CI–2C) and is summarized at page 3 of libellants' brief (Document 49).

Respondent contends that, since repairs were actually made to the damaged cargo for which libellants paid, the cost of such repairs represents libellants' loss and the maximum measure of its liability. Since libellants cannot establish that even the available Body Shop invoices (see invoices listed on three sheets attached at the end of Stipulation of 12/3/64, being Document 42) covering some of those damaged cars specified in Counts 1–4 of the Libel in No. 171 of 1960 apply only to damage in transit, as opposed to damage incurred prior to shipment, respondent contends that such invoices, though they are the best evidence in the record, are not reliable proof of the damage which libellants are entitled to recover.

■ Before considering the law applicable to these contentions, the undersigned finds that libellants are entitled to recover for the damaged parts which had to be replaced, as claimed in the transit damage claims, in view of the testimony received without objection at N.T. 142 that the prices for replaced parts appearing on the transit damage claims are the same as the prices in the applicable parts price books.

■ Since there is no evidence of the market value of the cars upon arrival in this country in the damaged condition in which they were delivered by respondent (the value as damaged), as compared with the value of the goods without the damage done in transit on respondent's ships,[6] libellants are entitled to recover

---

6. The only evidence offered by libellants related to the cost of repairing the damage done in transit, as shown on CR–1A to CR–6A, CI–1A and CI–2A, CR–1B to CR–6B, CI–1B and CI–2B, CR–1C to CR–6C, CI–1C and CI–2C. However, RO–1 to RO–66 cover repairs of all damage appearing on cars sent to the Body Shop. See footnote 9 below.

the actual cost [7] to them of the repairs to the cars unless a good reason has been shown why these actual costs cannot be determined. Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593, 594 (2nd Cir. 1942); O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 505 (2nd Cir. 1947).

■■ The primary object is to compensate libellants for the loss suffered. See Illinois Cent. R. Co. v. Crail, 281 U.S. 57, 64–65, 50 S.Ct. 180, 74 L.Ed. 699 (1930).[8] As stated in the *Weirton Steel Co. case*, supra, 126 F.2d at 594, " * * * the fundamental principle [is] that damages are only to provide indemnity."

■ In accordance with the above principle, admiralty cases have emphasized that where damaged vessels or goods have been repaired, the cost of repairs, rather than the testimony of experts, furnishes the basis for determination of the amount of legally enforceable damages. See The Schooner Catharine v. Dickinson, 58 U.S. (17 How.) 170, 174–175, 15 L.Ed. 233 (1854); The Hygrade No. 24 Inc. v. The Dynamic, 143 F.Supp. 634, 636 (E.D.N.Y.1955), modified and reversed on other grounds, 233 F.2d 444, 448 (2nd Cir. 1956); O'Brien Bros. v. The Helen B. Moran, supra; The City of Chester, 34 F. 429, 430 (S.D.N.Y. 1888); see, also, cases cited at pp. 74–79 of Respondent's Brief (Document 50).

In the *Hygrade case*, supra, the court said at page 448:

" * * * where, as here, complete repairs have been made, the amount of recovery may not exceed the actual cost, even though a greater expenditure would have been within range of reasonable cost."

Prior to the offering of the Body Shop invoices (RO–1 to 66) into evidence by respondent, the expert testimony of Mr. Sees that the repair charges set forth in the schedule marked L.Misc. 5 were fair and reasonable charges in Philadelphia during 1959 for the work specified in that schedule (N.T. 212), and that he had used this schedule in submitting bills to libellants (N.T. 218–9) permitted a fact finder at the end of the libellants' case to compute the damages on the basis of L.Misc. 5, but, since the actual costs shown in RO–1 to RO–66 are now in evidence, these actual costs present a fairer and more reliable basis for estimating the damages to cars repaired in the Body Shop prior to its being closed after September 25, 1959. The cases cited above indicate that it is doubtful whether the opinion of the expert, Mr. Sees, as to his estimates of costs of repairs as shown on a schedule could be a legal basis for a finding of damages for libellants on this record.

■ In this case, libellants' costs of repairing 13% of the cars covered by Counts 1–4 are known, since RO–1 to RO–66 contain the cost of repairs of all damage to these cars, both before and after their ocean voyage.[9] In view of the failure of libellants to offer evidence of loss of similar records covering the cost of repairs to other cars arriving more than three months prior to the closing of

---

7. There is no evidence that the cost of repairs exceeds the difference between the value of the cars before and after the injury. Cf. O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 505 (2nd Cir. 1947).

8. Libellants have the duty to take all reasonable steps to minimize their loss. See The Mascot, 282 F. 766, 771 (3rd Cir. 1922); Compagnie De Navigation, etc. v. Mondial United Corp., 316 F.2d 163, 171 (5th Cir. 1963); The Nyland, 164 F.Supp. 741, 745, 747 (D.Md.1958).

9. When the cars were repaired in the Body Shop, all damage to such cars was rectified. N.T. 529 and 552. For this reason, the use of the Body Shop invoices (RO–1 to RO–66) as a basis for the cost of repairing the damage on respondent's vessels is actually more favorable to libellants than such proofs technically justify, since it is conceded that some damage occurred prior to transit.

that shop on September 25, 1959,[10] libellants may not complain of a computation of damages based on the repairs for which respondent produced the actual cost records.[11] Even though some of the cars shown on the transit damage claims submitted by libellants were repaired by either other repair shops or the dealers, libellants have not submitted any evidence showing inability to produce the records covering such repairs. See footnote 11 above. The testimony of Mr. Sees that L.Misc. 5 represents the reasonable charges in the Philadelphia area for years, both before and after 1959,[12] for the repairs shown on that schedule does not establish that libellants paid amounts as large as this to their dealers for such repairs, in view of the charges shown in R–14. Respondent's analysis of the dealers' records in R–14, which is explained at pp. 62–65 of respondent's brief (Document 50), has been marked Exhibit R–14A. Exhibit R–14A shows that the dealers were paid and charged in 1958 substantially less than the amounts shown in L.Misc. 5[13] and, as stated above, libellants' expert (Mr. Sees) indicated that repair costs in years before and after 1959 were the same—namely, those shown in L.Misc. 5. See footnote 12.

Damages may be determined by the formation of a practical judgment based on fairly representative samplings. See Compagnie De Navigation, etc. v. Mondial United Corp., 316 F.2d 163, 171 (5th Cir. 1963); cf. United States v. Mortimer, 118 F.2d 266, 269 (2nd Cir. 1941); United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 305–6 (D.Mass.1953). Under these circumstances, the determination of the damages claimed in the first four counts of No. 171 of 1960 on the basis of the invoices of the Body Shop covering repairs to 13% of certain makes of cars covered by Counts 1–4, as computed in Exhibit A attached to this opinion, is the fairest method of computing the damages to the cars covered by these counts on this record.

The Body Shop invoices (RO–1 to RO–66) are supported by the testimony of Mr. Russell (N.T. 526–575) who had been employed by the Royston Body Shop in 1958 and 1959 and had been the manager of that Shop during the last six to nine months prior to the Shop's closing on September 25, 1959 (N.T. 527). Three men worked under him in the Body Shop (N.T. 529). Mr. Russell impressed the undersigned as an accurate and truthful

10. Libellants have the burden of proving the best evidence reasonably obtainable to show the damage they have suffered. See Mountain States Tel. & Tel. Co. v. Hinchcliffe, 204 F.2d 381, 383 (10th Cir. 1953), and cases there cited.

11. Where the libellant has all the damage information, the court is entitled to rely on the actual records produced. See Weirton Steel Co. v. Isbrandtsen-Moller Co., supra, 126 F.2d at p. 594, and cases there cited. For this reason, libellants' argument that some of the cars covered by Counts 1–5 may not have been repaired in the Body Shop is not persuasive, since they have shown no reason why the repair bills could not have been produced if the repairs were done by Mr. Sees' garage, similar repair companies, or the dealers of libellants. It is noted that these suits were instituted in 1960 and yet libellants have produced no 1959 repair bills from dealers or others, although they have produced 1958 repair bills (see, for example, R–14). Miss Thomas testified that the cost of the repairs could be computed (p. 274 of Document 31 in No. 141 of 1960). The testimony of Miss Thomas also appears in Documents 30 and 32 of No. 141 of 1960.

12. Mr. Sees' testimony indicates that he had been using the amounts on L.Misc. 5 in fixing his charges to libellants for ten years (N.T. 217–219).

13. Respondent's similar analysis of the records, marked L–6 and R–1 to R–4, has been filed in the Clerk's file as Document 54. Similarly, it shows that the amounts paid by respondent to its dealers for repairs in 1958 were substantially less than those shown in L.Misc. 5. Allowance of 35% of the charges shown in L.Misc. 5 would appear to be somewhat more than the rate actually paid by libellants for the repairs listed in R–14A and Document 54.

witness, who had no interest in the result of this litigation. A record was kept of the work (fixing dents, scratches, damages to painting, etc.) done on each car (N.T. 527). All damage noticed on the body of each car coming into the shop was fully repaired (N.T. 529 and 552). The time spent on the car was indicated on the invoice and Mr. Russell approved each invoice as manager of the Shop (N.T. 530–1). The employees in the Body Shop received from $1.50 to $2.00 per hour (N.T. 553) and the invoices charged for time at the rate of $3.00 per hour.

The detailed testimony of Mr. Russell concerning the methods used to repair the types of damage described in the pier survey reports (Smith Surveys) is one of the major bases for rejection by the trial judge of the expert testimony of Mr. Sees that the L.Misc. 5 schedule of prices is reasonable for repairing the damage shown in such reports.[14] Mr. Elliker was primarily familiar with New York area charges and the testimony of Mr. Russell indicates that he did not automatically apply the schedule in L.Misc. 5 in making his estimates.

Although libellants offered testimony that "At sometimes there were so many damages, and dealers needed their cars so badly, that we would do the various obvious difficult ones, so far as our body shop had the capacity to do them" (N.T. 177), the record makes clear (see, also, page 15 above) that the dealers' charges were no higher than 35% of the costs shown on L.Misc. 5 (see R–14, R–14A, and exhibits referred to in Document 50). The evidence does not support the testimony that a flat rate of $20.00 per car (see N.T. 321 and L.Misc. 10) was paid to the dealers to cover repairs for the cars listed in the transit damage claims submitted under Counts 5 and 6 of No. 171 of 1960 and Counts 1 and 2 of No. 399 of 1960 (CR–5C, CR–6C, CI–1C and CI–2C). The only records of $20.00 being paid for any of these cars are as follows: [15]

> Morris Minor Tourer No. 754245, shown at bottom of 5th yellow page of CI–1C and on L–7A
>
> Morris Minor Tourer No. 752902, shown as next-to-last item on 6th yellow page of CI–1C and on L–7A

Libellants' contention at page 19 of their brief (Document 49) that the Body Shop invoices "contain no amounts for a reasonable profit or overhead" must be rejected in view of the testimony at N.T. 384 that "Between companies we take costs plus overhead, a figure worked out by the accountant * * *" (see, also, paragraph 9 on page 7 of respondent's Reply Brief, being Document No. 56).[16] Since the libellants have the burden of proof (see Burch v. Reading Company, 240 F.2d 574 (3rd Cir. 1957)), an item for warehousing costs while the cars were awaiting repairs cannot be included when there is no evidence of such costs in the record.

14. A detailed comparison of the repairs made in the Body Shop, as indicated on RO–49, RO–58, RO–59, RO–55, RO–51, RO–46, RO–37, RO–48, RO–52, RO–42, RO–45, RO–47, RO–39, RO–43, RO–50, RO–53, RO–56, RO–57, RO–54, RO–38, RO–41, RO–40, and RO–44, with the damages shown on the Smith Survey (CR–1–1B) covering cars 699815, 700395, 700156, 699997, 700746, 695932, 695400, 695399, 692467, 694660, 1357, 62873, 62876, 62870, 62994, 62871, 63369, 63319, 62996, 63429, 62995, 62863 and 62874, respectively, demonstrates that the repairs done in the Body Shop covered the items of damage shown on the Smith Survey.

15. $40.00 damages will be included in the judgment to cover the repairs to these cars. It is noted that the amounts claimed on the transit damage claims for repairs to these cars exceed $20.00 in each case. Miss Thomas' testimony concerning the flat rate appears at pp. 259 ff. of Document 31 in No. 141 of 1960 and pp. 306 ff. of Document 32 in No. 141 of 1960.

16. Also, it is noted that libellants have not pointed out any evidence in the record supplying the amount of reasonable charges for overhead.

In the absence of any definite evidence concerning the repairs to the cars covered by Counts 5 [17] and 6 of No. 171 of 1960 and Counts 1 and 2 of 399 of 1960, this record justifies the application of the 35% computed in Exhibit A to the claims covered by these counts, with the adjustment of a $20.00 allowance for each of the two cars covered by Count 1 of 399 of 1960 which are listed above. For the reasons stated above, the fact finder cannot accept the figures in L.Misc. 5 or a $20.00 flat figure for each of these cars.

The application of the 35% to the labor costs claimed in these counts is as follows:

| 1.<br>Count<br>No. | 2.<br><br>Parts | 3.<br>Transit Damage Claim<br>After Deleting Parts | 4.<br>35% of<br>Col. 3 | 5.<br>Cols. 2<br>Plus 4 |
|---|---|---|---|---|
| No. 171 of 1960 | | | | |
| 5 | $1,014.90 | $2,838.50 | $993.48 | $2,008.38 |
| 6 | 23.78 | 815.72 | 285.50 | 309.28 |
| No. 399 of 1960 | | | | |
| 1 | 220.42 | 1,315.08 | 460.28 | 720.70[18] |
| 2 | 339.80 | 2,398.20 | 839.37 | 1,179.17 |
| | | TOTAL | | $4,217.53 |

———◆———

In accordance with the foregoing, libellants will be entitled to the entry of judgment in their favor in the total amount of $15,630.95, computed as follows, unless counsel request a further hearing under II above which results in a recomputation of the damages:

Damages covered by Counts 1–4 of No. 171 of 1960, as shown on Exhibit A, page A–2 ..... $ 8,594.72

Damages covered by Counts 5 and 6 of No. 171 of 1960 and Counts 1 and 2 of No. 399 of 1960, as shown above ..... 4,217.53

Interest for 5½ years at 4% per annum on the above-mentioned total of $12,812.25 ($8594.72 plus $4217.53) ..... 2,818.70

Amount of Judgment ..... $15,630.95

The trial judge has received a great deal of assistance from the thorough and able briefs submitted by counsel, which have been placed in the Clerk's file as Documents 49, 50, 55 & 56.

### EXHIBIT A

As shown by the schedule, at the end of this Exhibit, of autos for which there are available Body Shop Invoices, there are a total of 64 cars covered by the first four counts of the Libel in No. 171 of 1960 for which such invoices have been received in evidence. These cars are of the following five makes:

Morris Minor
MG A
A. H. Sprite
A–H "3000"
Austin A–55

There are a total of 488 cars of these makes covered by the claims under these four counts, so that these invoices apply to 13% of these claims for damages to autos of these makes.

17. Some or all of the cars listed in Count 5 may have been repaired in the Body Shop as they arrived in Philadelphia on 7/28/59.

18. This amount includes $20.00 for Car No. 754245 and $20.00 for Car No. 752902, as explained at page 17 above.

This schedule shows that the Body Shop charges for these 64 cars totaled $933.19, whereas the claims for repairs to these autos in the transit damage claims (based on the schedule in L.Misc. 5) totaled $2,806.78. $933.19 is approximately 35% of $2,806.78.

### APPLICATION OF 35% TO COUNTS 1–4, EXCEPT FOR PARTS

| 1. Count No. | 2. Parts | 3. Transit Damage Claim After Deleting Parts | 4. 35% of Col. 3 | 5. Cols. 2 Plus 4 |
|---|---|---|---|---|
| 1 | $397.92 | $ 3,625.00 | $1,268.75 | $1,666.67 |
| 2 | 308.19 | 10,565.48 | 3,697.92 | 4,006.11 |
| 3 | 51.94 | 4,912.87 | 1,719.50 | 1,771.44 |
| 4 | 2.45 | 3,280.15 | 1,148.05 | 1,150.50 |
| | | TOTAL | | $8,594.72 |

### SCHEDULE OF COMPARISON OF TRANSIT DAMAGE CLAIMS AND BODY SHOP INVOICES COVERING CERTAIN MAKES OF CARS COVERED BY COUNTS 1–4 OF NO. 171 OF 1960

| Count | Type of Auto | Transit Dam. Claims Excl. Parts | Body Shop Chg. | % | Total Damaged | No. for Which There Are B/S Reports | % |
|---|---|---|---|---|---|---|---|
| 1 | Morris Minor | $ 423.29 a | $116.75 | 28% | 52 | 10 | 19% |
| 1 | MG A | 442.00 b | 119.35 | 27% | 48 | 13 | 27% |
| 2 | A. H. Sprite | 386.50 c | 160.50 | 42% | 144 | 9 | 6% |
| 2 | A–H "3000" | 130.00 d | 51.70 | 40% | 21 | 3 | 14% |
| 2 | Austin A–55 | 799.28 e | 210.95 | 26% | 55 | 11 | 20% |
| 3 | Morris Minor | 95.00 | 35.00 | 37% | 30 | 3 | 10% |
| 3 | MG A | 48.00 f | 38.90 | 81% | 20 | 2 | 10% |
| 3 | A. H. Sprite | 32.00 | 7.55 | 24% | 41 | 1 | 2% |
| 3 | A–H "3000" | 72.50 | 31.74 | 44% | 11 | 1 | 9% |
| 4 | MG A | 220.00 g | 60.40 | 27% | 19 | 6 | 32% |
| 4 | Morris Minor | 34.00 | 15.80 | 44% | 24 | 1 | 4% |
| 4 | A–H "3000" | 150.50 h | 84.60 | 56% | 23 | 4 | 17% |
| | TOTAL | $2806.78 | $933.19 | | 488 | 64 | |

a. $449.58 minus $26.29.
b. $473.81 minus $31.81.
c. $417.78 minus $31.28.
d. $136.58 minus $6.58.
e. $1072.34 minus $273.06.
f. $83.66 minus $35.66.
g. $222.13 minus $2.13.
h. $150.82 minus $ .32.