**RICHARD CONSTRUCTION COMPANY, Inc., Plaintiff,**

v.

**MONONGAHELA AND OHIO DREDGING COMPANY, Defendant.**

Civ. A. No. 67–584.

United States District Court
W. D. Pennsylvania.

April 3, 1968.

John L. Spiegel, of Plowman & Spiegel, Pittsburgh, Pa., for plaintiff.

Frank E. Coho, and Robert G. Macalister, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

The plaintiff, Richard Construction Company, Inc., sued the defendant, Monongahela and Ohio Dredging Company, for the breach of a contract to transport for $300 plaintiff's one-story frame building from the bank of the Monongahela River near Maxwell Dam to a point on the same bank approximately seven miles up that navigable river at Rice's Landing near Old Lock No. 6. The defendant contracted to move the building but damaged it in the process, and failed to deliver it at the agreed destination. The plaintiff contends that the damage was caused by the negligent breach of its contract with the defendant. The defendant denies negligence and contends that the plaintiff's officers misrepresented the weight of the building, which misrepresentation was the cause of the damage. The defendant counterclaims for the cost of the transportation at $65 per hour, or a total of $910, which it contends was the agreed price.

The building involved was owned by the Corps of Army Engineers who put it up for sale at public auction in the latter part of December, 1965. Mr. Richard K. Lightholder, the president of the plaintiff company, contemplated bidding on this building and relocating it on the company's land. Mr. Lightholder asked Mr. A. H. Locke, vice-president of defendant company, how much it would cost to transport the building on the river to the designated point. Since the defendant company was then dredging in the vicinity of Old Lock No. 6 and had its equipment available, Mr. Locke estimated the cost of transportation at $300 to $350. Subsequently, Lightholder pointed out to Locke the destination point.

On December 23, 1965, Lightholder's bid of $400 for the building was accepted by the Army Engineers, it being the highest and best price bid. A condition of the sale was that plaintiff would move the building from the land on which it was erected. Plaintiff did not undertake to move the building from that land until June, 1966, about 4 months after the defendant had finished its work at Old Lock No. 6. In June, the defendant's equipment was some ten miles down river from Maxwell Dam at Palmer, Pennsylvania.[1]

From time to time, Mr. Mitchell Sinclair, vice-president of the plaintiff company, by telephone importuned Locke to

---

1. Plaintiff's reliance on promissory estoppel is misplaced. Even if the defendant had agreed to transport the building for $300, as plaintiff contends, and plaintiff relied on that agreement in bidding on the building at public auction for $400, it is clear that the defendant's price was based on his equipment being in the vicinity of Old Lock No. 6.

fix a day to transport the building up river. Eventually, Sunday, June 26, 1966, was the day agreed upon and during a final telephone conversation, Locke told Sinclair that the charge for moving would be $65 an hour. Although Sinclair protested, insisting that Locke had previously agreed to $300, the arrangement for transportation was not rescinded.

■ The plaintiff did not meet its burden of establishing by a fair preponderance of the evidence a bilateral contract whereby defendant was to transport plaintiff's building to the prearranged destination up the river for the sum of $300. On the other hand, the court finds that the plaintiff accepted defendant's offer to transport the building to the prearranged destination at the rate of $65 an hour.

■ The court finds as a fact that the building weighed less than 25 tons. It was represented to Locke that 20 to 25 tons was the approximate weight of the building. Sinclair thought the building weighed between 20 and 25 tons and urged Locke to look at the building himself "just to be on the safe side." Locke, whose experience in lifting heavy loads with his crane was considerable, made it his business to look at the building on June 25th, the day before the transportation was to take place, and at least tacitly concurred in that estimate. An experienced builder, Mr. Elmer W. Dickey, Jr., examined the building before and after June 26th and estimated its weight at approximately 20 tons. After the damage occurred Lightholder by standard engineering methods calculated the weight of the building together with underpinning and lifting bar to be less than 25 tons. At trial Locke was of the opinion that the building and underpinning weighed 35 tons. All the foregoing were competent to express opinions concerning the weight of the building. We think the weight of the evidence is in favor of the plaintiff.

Some time prior to June 26th, the plaintiff had engaged T. R. Lyda Com-

pany to construct the underpinning and to move the building from its location to the bank of the river. At that place, plaintiff's employees attached the cable slings to the underpinning and to a lifting bar procured from Fort Pitt Bridge Company, and in all respects prepared the building for the defendant's crane to lift it from the bank of the river and place it on a scow for the trip up the river.

On June 26th, a Sunday, Locke and his crew started to work at 7:00 A.M. and were underway at 7:50 A.M. with defendant's equipment consisting of a derrick boat, a dump scow, and a tugboat. Locke himself operated the crane and was in command of the crew consisting of a navigator and a fireman. On that day, these men were in the employ of the defendant company and were paid by defendant company for the work performed by them in transporting the plaintiff's building. At all times, they were under the command of Locke.

The equipment arrived at the shore where the building was located at about 10:00 o'clock. The defendant's crane was rigged with a two-part line. The line was hooked to the lifting bar, and the crane operated by Locke proceeded to drag the building to the edge of the bank, where it became snagged. Plaintiff, who happened to have a high-lift available, at the request of Locke pushed the building off the bank and it was suspended over the water at the end of the crane's cable. At this point, Locke found that his equipment was unable to lift the building. Moreover, the building was slanted either because the cables had been pushed out of position when the building was dragged to, and snagged on, the bank or they had not been properly placed by plaintiff's workmen.

Prior to dragging the building to the edge of the bank, Locke made no test to ascertain whether the crane could lift the building with a two-part line. A four-part line could have been rigged in a short time. Locke did not ascertain whether the cables had been properly affixed so that when suspended the house

would be level. The crane was unable to lift and place the slanted building on the dump scow.

After consultation with Sinclair, it was agreed that Locke would transport the building several hundred feet up the river to a low bank where it might be beached and leveled. This plan proved impossible because the boom of the crane could not get under intervening high voltage wires (T., pp. 185–186). Following further conversation with Sinclair, and there being no reasonable alternative, Locke towed the building, emersed, up the river and deposited it on a low bank 800 to 1000 feet from the agreed destination point. It did not appear from the evidence that there was any other low bank on which the building might have been placed without the necessity of emersing it in the river.

Towing the house through the river caused considerable damage, inter alia, to the ceiling, walls, floor, joists, roof, door, jambs, windows and exterior siding; the toilet facilities had to be reset, and the heating and electrical equipment had to be cleaned. It was not disputed that the estimated cost to repair the damage thus caused amounted to $3500.

■ The court finds that the defendant by its vice-president, Locke, was negligent in failing to provide equipment of sufficient capacity to safely lift the building from the bank onto the scow; in failing to properly rig the equipment to increase its capacity so as to insure the safe lifting of the building; in failing to test the ability of its equipment to lift the building and ascertain that it was level in suspension prior to snagging it on the edge of the bank.[2] It seems that installation of a four-part line would have insured that the crane could have lifted the building. The defendant was negligent in not furnishing equipment with sufficient capacity to transport a 25-ton building safely to the agreed point of destination. Such negligent breach of the contract to transport on the part of the defendant was the proximate cause of the plaintiff's damages.

■ The court finds that the plaintiff was not guilty of contributory negligence. Sinclair's failure to protest the towing of the building up river emersed cannot be construed as contributory negligence or assumption of risk. After the building was snagged on the bank and suspended over the water and, because of Locke's negligence, could not be replaced on the shore, Sinclair had no reasonable alternative but to acquiesce in Locke's decision to tow the building up river emersed, so that the boom could clear intervening bridges and high tension wires, and place it on a low bank. Cf. Prosser on Torts, p. 465 (3d ed.).

Plaintiff engaged T. R. Lyda Company to move the building from the low bank on which defendant had placed it to the location agreed upon by Lightholder and Locke at a cost of $497.50.

Although the building was bid in by plaintiff at public auction for only $400, there was undisputed testimony by Dickey, an experienced builder, that the building as relocated on a foundation on plaintiff's land had a fair market value of $8,000.

■■ Defendant invokes the general principle that costs of repairs can never exceed the fair market value of the damaged property, and that the fair market value is best determined at a public sale. However, the public sale of the building was not made under ordinary conditions; the building had to be moved from its site by the highest bidder at his expense. The court finds that the fair market value of the building as relocated on plaintiff's land plus costs of transportation were in excess of the cost of repairs and the costs of moving the building from where it had been placed by the defendant to the previously agreed location.

The plaintiff's damages consist of the following: cost of repairing the damage to the building, $3,500; cost of moving

2. Cf. Ex. ASA B 30.2, § 301 at p. 81.

it to the agreed destination, $497.50. The fundamental principle is that damages are to provide indemnity.[3]

██ In the opinion of the court, the contract of affreightment was maritime in nature,[4] the negligence of the defendant occurred in the waters of the Monongahela River,[5] and, therefore, the cause is maritime and within the admiralty and maritime jurisdiction of this District Court. The Constitution, Art. III, § 2; 28 U.S.C.A. § 1333. Oral contracts of affreightment are valid under maritime law.[6]

██ The defendant is precluded from recovering on its counterclaim by reason of its failure to properly perform its contract.[7] Under the general maritime law of carriage, the conveyance and delivery of the cargo is a condition precedent and must be fulfilled before the shipowner can demand his freight. Absent a voluntary acceptance of the cargo by the shipper at another destination, the cargo must be delivered to the agreed destination before the shipowner can collect his freight.[8] Here it was not, and the shipper did not voluntarily accept delivery at 800 to 1000 feet short of the destination upon which the parties had previously agreed.

Judgment should be entered in favor of the plaintiff and against the defendant in the sum of $3,997.50, and on the counterclaim judgment should be entered in favor of the plaintiff and against the defendant.

This opinion shall be deemed to embody findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

An appropriate order will be entered.

On Motion to Amend Findings of Fact, to Alter or Amend Judgment and for a New Trial

MARSH, District Judge.

Pursuant to Rules 52 and 59, Fed.R. Civ.P., the defendant moves to have the findings of fact and the judgment entered on April 3, 1968, amended "to conform to the record in this case and to the applicable law * * *." No request was made by the defendant to take additional testimony; instead it stated in the motion: "If additional testimony is desired by the Court on any of the foregoing, a new trial is requested therefor." Briefs in support of and in opposition to the motion were submitted;[1] oral argument was waived. The court does not

---

3. 80 C.J.S. Shipping § 158; Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593 (2d Cir. 1942); Royston Distributors, Inc. v. Moore-McCormack Lines, Inc., 252 F.Supp. 480, 486–487 (E.D.Pa. 1965). Cf. The Baltimore, 8 Wall, 377, 385–388, 75 U.S. 377, 385–388, 19 L.Ed. 463 (1869); The Schooner Catharine v. Dickinson, 17 How. 169, 174–175, 58 U.S. 169, 174–175, 15 L.Ed. 233 (1854); Williamson v. Barrett, 13 How. 101, 110, 54 U.S. 101, 110, 14 L.Ed. 68 (1851).

4. Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); North Pac. S. S. Co. v. Hall Bros. etc., Co., 249 U.S. 119, 125, 39 S. Ct. 221, 63 L.Ed. 510 (1919); Morewood v. Enquist, 23 How. 491, 64 U.S. 491, 16 L.Ed. 516 (1859); Gilmore and Black, The Law of Admiralty, pp. 18–21 (1957 ed.); Benedict on Admiralty, §§ 63, 64 (6th ed.).

5. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 763 (3d Cir. 1963); 46 U.S.C.A. § 740.

6. Kossick v. United Fruit Co., supra, 365 U.S. p. 734, 81 S.Ct. 886; Hellenic Lines Limited v. Gulf Oil Corporation, 340 F. 2d 398, 402 (2d Cir. 1965).

7. The 14 hours for which defendant seeks recovery was at least 4 hours more than would have been normally required to fulfill the contract had no difficulties been encountered.

8. Brittan v. Barnaby, 21 How. 527, 535, 62 U.S. 527, 535, 16 L.Ed. 177 (1858), citing 3 Kent, 218; Caze v. Baltimore Insurance Co., 3 L.Ed. 370, 11 U.S. 358, 7 Cranch 358 (1813); Palmer v. Lorillard, 16 Johns 348, *356 (N.Y.1819); Gilmore and Black, op. cit. supra f.n. 4, p. 221; Robinson on Admiralty, § 82 (1939).

1. The defendant presented no argument for a new trial in its brief.

desire additional testimony on any point raised in the motion. In our opinion the motion to amend the findings and judgment and for a new trial should be denied.

The court took jurisdiction of this action as one in admiralty. With respect to its counterclaim, the defendant in its motion seems to urge that the law of contracts should supersede the maritime law as the court understood and applied it. Since this is an admiralty action (defendant does not now contend to the contrary), then admiralty and maritime law should be applied to the facts as found by the court. In applying that law in a dispute between a carrier and shipper, it seems clear that the former is liable to make the latter whole by paying full compensatory damages which the carrier negligently caused to the cargo,[2] and, absent consent or fault on the part of the shipper, is not entitled to the freight for failure to deliver the cargo at the agreed point of destination. As stated in The Gracie D. Chambers, 253 F. 182, 183 (2d Cir. 1918), aff'd 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919):

> "By our law freight is earned only upon delivery of cargo. The ship may have carried the cargo on a voyage of 3,000 miles, and to within 1 mile of destination; but the carrier has earned no freight, and must return any freight prepaid if he has not delivered."

That principle is well established by the authorities.[3] We are not aware of any decision that imposes a different maritime rule of law with respect to a private carrier, and none has been brought to our attention.

Under the common law, a carrier could not recover the freight for cargo which it failed to deliver as agreed,[4] and although courts of admiralty do modify the harshness of the common law in appropriate circumstances, under the facts as found here, no maritime precedent has been called to our attention which requires a modification. On the contrary, it appears that the principle is not to be varied even though part performance by the carrier conferred great benefit on the shipper, possibly even greater benefits than full performance would have. Cf. Hopper v. Burness (1876) Q. B. 34 L.T.R. (n. s.) 528; The Industrie [1894 C.A.] P. 58, where sale of the cargo at an intermediate port of legitimate maritime purposes brought a higher price than it would have at destination. Thus, even if we accept the dubious argument that plaintiff received benefit from part performance, the defendant still is not entitled to the freight.

An appropriate order will be entered.

2. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Schuylkill Transp. Co. v. Banks, 152 F.2d 405, 407 (3d Cir. 1945).

3. The Harriman, 9 Wall. 161, 171–172, 76 U.S. 161, 171–172, 19 L.Ed. 629 (1869); The Kimball, 3 Wall. 37, 45, 70 U.S. 37, 45, 18 L.Ed. 50 (1865); Toyo Kisen Kaisha v. W. R. Grace & Co., 53 F.2d 740 (9th Cir. 1931); Burn Line v. United States & A. S. S. Co., 162 F. 298 (2d Cir. 1908); The Nathaniel Hooper, 17 Fed.Cas.No.10,032, pp. 1185, 1189 (D.Mass.1839). See also, fn. 8 in opinion filed April 3, 1968.

4. The Harriman, supra, 76 U.S. at pp. 172–175.