**WEIRTON STEEL CO. v. ISBRANDTSEN-MOLLER CO., Inc.**

**No. 154.**

Circuit Court of Appeals, Second Circuit.

March 11, 1942.

Herbert M. Statt and Haight, Griffin, Deming & Gardner, all of New York City (Edward H. Mahla, of New York City, of counsel), for appellant.

F. Herbert Prem and Bigham, Englar, Jones & Houston, all of New York City, for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal concerns only the proper rule of damages to compensate the libellant for injury to a parcel of tin plate while on board the respondent's vessel on a voyage from Baltimore to Hong Kong. At the outturn 2,701 cases out of a total of 6,043 were found to have been damaged by "liquefied resin." The consignee, the Texas Company, at first declared that it would abandon these cases, but it accepted them after it had made a settlement with its underwriter, which paid $10,117.26 for the damage done. The parties have agreed that the respondent shall bear 85% of whatever the loss may be proved. The libellant is the shipper, but the party actually interested is the underwriter. The evidence was documentary except for two depositions taken by the libellant, of which the only one of importance was that of one Anderson, a surveyor of the Texas Company. After agreeing to keep the damaged plates, the Texas Company reconditioned them so far as possible, and after making them into five gallon oil cans, it sold them full of oil in due course. The reconditioning left the plates dull and imperfect in appearance, but the libellant did not prove whether these blemishes compelled the Texas Company to abate any part of the full market price either on sale or later, or whether they resulted in any returns. It may, however, be taken as true that it would have been not only costly, but impractical, to keep records showing what was the difference, if any, between the sale prices of the damaged cans and the sound ones. Out of 656,258 five gallon cans manufactured at the Texas Company's Hong Kong plant, 283,580 were made from the reconditioned plates. Anderson swore to what it had cost him to recondition a number of the plates and from this experience he concluded that to recondition all those damaged would have cost 42% of their sound value, which he assumed to be the same as the amount of the invoice. Moreover, since the plates when recondi-

tioned were not as good as new, he consulted certain Chinese merchants in Hong Kong who advised him that they would pay only 48% of the value of the damaged plates as they were, i.e., not reconditioned. From this information and his own experience he computed the total damage at 52% of the invoice value of the goods. (It is not apparent just what connection the libellant sees between the reconditioning charges and this discount for depreciation demanded by the Chinese merchants; but we may assume that one is supposed to confirm the other.) The Texas Company's actual cost of reconditioning was only $1,073.59, but it did not appear how the cans compared in appearance with those plates which Anderson had personally reconditioned. The respondent argues that the recovery should be limited to 85% of the Texas Company's cost of reconditioning; or if not, then to that sum, plus 85% of 10% of the invoice value as a depreciation allowance. The judge entered a decree for the libellant's claim, 85% of $10,117.26.

■ The ordinary rule is indeed that damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged. Chicago, M. & St. P. R. Co. v. McCaull-Dinsmore Co., 253 U.S. 97, 100, 40 S.Ct. 504, 64 L.Ed. 801; St. Johns N. F. Shipping Corp. v. S. A. Companhia, etc., 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201. That is obviously the right measure where the consignee buys the goods for resale which is the ordinary case; but at times it works out to give him more than indemnity, and when it does, the courts have refused to adopt it. Illinois Central R. Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699, 67 A.L.R. 1423, was such an instance; the consignee claimed the retail value of a parcel of coal lost en route; but, although he was a retail dealer, he was allowed only the wholesale price because he had been able to replace his reserve at wholesale prices without loss of any retail sales. The First Circuit in United States v. Palmer & Parker Co., 1 Cir., 61 F.2d 455, 459, 460, applied the same doctrine to damages for delay in the delivery of mahogany logs which the consignee used for veneer. He was not allowed the difference between their value when they should have been delivered and when they were in fact delivered, because he did not prove that, if used for veneer, they had become less

valuable. Magdeburg Gen. Ins. Co. v. Paulson, D.C., 29 F. 530, is another example of the same doctrine. In Phillipine Refining Corp. v. United States, D.C., 33 F.2d 974, affirmed 2 Cir., 41 F.2d 1010, the damaged oil "could not be used for high grade toilet soap, which was its intended use, but could be used for laundry soap," 33 F.2d at page 976. Even if the consignee did use it for laundry soap, he would have been entitled to damages measured by the ordinary rule, because he had had to pay for his raw material the additional difference between the price of pure, and contaminated, oil. In The President Arthur, D.C., 28 F.2d 391, on the other hand, the general rule does seem to have been so applied as to give the consignee more than indemnity.

■ We have therefore no doubt that, if it affirmatively appeared that the Texas Company had sold the cans and their contents at no reduction, the libellant could recover only the reconditioning cost; it seems to us plain that any other rule would violate the fundamental principle that damages are only to provide indemnity. But the evidence does not go so far; the libellant proved nothing about the Texas Company's sales except that it would have been impracticable to keep separate accounts for the damaged cans and the undamaged. That we should not insist upon if it had appeared for example that any discount whatever had been claimed and allowed upon the whole parcel and what that discount was. But, considering the fact that 43% of all the five gallon cans sold at Hong Kong were made out of reconditioned plate, certainly it was not unreasonable to ask that the libellant—which has the burden of proof and certainly had better access to the evidence—should show that the Texas Company had been obliged to make an allowance of some kind. Meltzer v. Pennsylvania R. Co., D.C., 29 F.Supp. 840, 841. We are not to assume that there was not enough of a market price at Hong Kong for oil in five gallon cans to make evident any substantial departure from it upon sales in such large quantities; at least we should not assume so merely because it was impossible to keep separate accounts of damaged and undamaged cans. On a record like this it is quite as possible as not that the Texas Company sold the whole consignment at the market price; in any case it alone had all the information on that subject. While Anderson did say that the

Chinese buy the cans "looking forward to a fine looking can and reselling it inland, so that if it is a poor looking can or if it looks old he will not buy it," we know that all these cans were in fact sold, and it is entirely speculative to assume that they sold off price; and certainly it is impossible even to guess for how much off price. The fact that the underwriter agreed to pay the full amount claimed by the Texas Company is not material; for all we know, he may have thought it worth while to keep the good-will of an important customer.

We cannot see the propriety of allowing the ten per cent for deterioration which Anderson added; obviously if we are right in our reasoning, the only damages actually proved was the cost of reconditioning.

Decree modified to allow 85% of the cost of reconditioning, $1,073.89. Costs to the appellant.