**A. LEVATINO & SONS FRUIT & PRODUCE INC., Plaintiff,**

v.

**S.S. ATHINAI, her engines, boilers, etc., and Hellenic Lines, Ltd., Defendants.**

No. 73 Civ. 1502.

United States District Court, S. D. New York.

Jan. 9, 1975.

Bigham Englar Jones & Houston, New York City, for plaintiff; Robert J. Phillips, James Hart, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants; Alexander S. Kritzalis, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is an action in admiralty to recover damages arising from injury to cargo. Plaintiff, a New York corporation engaged in the distribution of produce, fresh fruits, and vegetables, was the consignee of a shipment of chestnuts under bill of lading No. 28 issued by defendant Hellenic Lines, Ltd., and dated October 24, 1972. Defendant, a Greek corporation, was at all material times the operator of the Greek flag steamer ATHINAI, engaged in the common carriage of goods by water for hire. The action was tried by the Court without a jury.

On or about October 24, 1972, at the Port of Leghorn, the shipper R & G Seppia, by its agent "Pilade Gianias," delivered to defendant, as carrier, for shipment to New York, 974 fifty-five-pound bags of fresh chestnuts. Defendant issued a clean bill of lading indicating receipt of the chestnuts in apparent good order and condition. "Phytosanitary Certificates" covering the shipment of chestnuts were issued by the Italian Government. According to the bill of lading, the bags were broken down into six lots and contained three sizes of chestnuts: "$60/65$," "$80/85$," and "$90/95$," with the size "$90/95$" denoting the smallest chestnuts.

The 974 bags of chestnuts were stowed in the No. 3 lower hold of the vessel ATHINAI, which constituted the reefer space. The bill of lading indicated that the temperature was "to be kept centigrades $+1/+2$." However, according to the deposition of the chief engineer of the ATHINAI and the ATHINAI's refrigerator log book, the temperatures for the voyage were mostly 3 to 4 degrees centigrade (37.4 to 39.2 degrees fahrenheit) with dips to 2° C (35.6° F) and an occasional rise to 6° C (42.8° F). Austin McCabe, Jr., plaintiff's expert on

chestnuts, testified that the most desirable air temperature for stowage of chestnuts is 32° F, with a range of 32° F to 40° F being acceptable. McCabe stated that "for each one degree the temperature rises the respiration rises and the enzymic action rises and it shortens the life of the product each degree." (Transcript, at 186.)

On Friday, November 17, 1972, the ATHINAI berthed at Hellenic Lines' terminal in Brooklyn. Sylvester Levatino, who was an officer of the plaintiff, testified that plaintiff expected the vessel to arrive around November 3, in time to sell the chestnuts for the Thanksgiving holiday. Levatino stated that the lateness of the vessel caused plaintiff to lose orders. However, there is no evidence that defendant had agreed to deliver the chestnuts before Thanksgiving or that the vessel was diverted during the voyage. At trial, plaintiff withdrew any claim that it was entitled to damages for late arrival of the ATHINAI.

On November 18, 1972, the day following the arrival of the ATHINAI, the 974 bags of chestnuts were discharged, and a joint survey was made by Max Barkus, plaintiff's surveyor, and Kjell Hansen, defendant's surveyor. Barkus testified that he observed the bags coming off the vessel on pallets and being stacked on the pier. The inspection was conducted by selecting two bags from each of the six lots and pulling out 100 chestnuts at random from each bag selected. Barkus testified and indicated in his written report that many of the bags and their contents were wet, that some chestnuts were sticky and that the wet bags emitted a musty odor. According to Barkus' report, the pulp temperatures of the chestnuts ranged from 38° F to 41° F and the chestnuts were: "Fairly well formed and shaped. Fairly well sized to some irregular and small for graded size. Fairly good color. Medium to dark brown color." Barkus also found that 2 to 6 percent, average 3 percent, of the chestnuts were snowballs, i. e. chestnuts covered with a heavy or wet mold; that 4 to 16 percent, average 7

percent, showed moderate to heavy surface mold; that 10 to 40 percent, average 25 percent, showed light surface mold; that 2 to 6 percent, average 3 percent showed worm injury; and that 2 to 8 percent, average 4 percent, showed decay. Hansen's report stated:

> "In all bags opened ex these lots we found nuts to be for the most part in apparent good order with some slight surface mold and with occasional 'snowballs' present estimated at less than 1%."

On November 20, the chestnuts were transported by plaintiff's trucker in an unrefrigerated truck from the Hellenic Lines' pier to plaintiff's premises in the Bronx. Levatino testified that when the chestnuts arrived at plaintiff's premises they were moldy, of dull color, and internally decayed. The chestnuts were placed in refrigeration at a temperature of 42° to 44° F. On the night of November 20 or the morning of November 21, the chestnuts were taken by unrefrigerated truck to the New York Fruit Auction ("Fruit Auction") for reconditioning, a process by which the bad chestnuts are picked out and the remaining chestnuts are rubbed to bring back the shine. On November 21, Phil Pepper of the Port Entry Expeditors, Inc. began reconditioning the chestnuts. The process took at least two or three days and resulted in the loss of 158 bags of chestnuts. While at the Fruit Auction, where some chestnuts remained at least until November 24, the chestnuts were not refrigerated.

The testimony of Levatino as to the events following the reconditioning is unclear. Levatino testified that after the chestnuts were reconditioned, plaintiff tried to sell them. However, he stated that since Thanksgiving was on November 23, plaintiff's customers had already bought their supplies for the holiday and plaintiff's chestnuts had to be carried past the holiday. Levatino further testified that on Friday, November 24 or Monday, November 27, some or all of the chestnuts were transported back from the Fruit Auction to plaintiff's premises where they were again placed in refrigeration.

During the remainder of 1972 plaintiff continued to try to sell the chestnuts and succeeded in making some sales both from the Fruit Auction and from plaintiff's premises. Levatino testified that if sales were effected from the Fruit Auction, then the chestnuts would be delivered from the Fruit Auction rather than from plaintiff's premises. In attempting to sell the chestnuts, it appears that plaintiff would shuttle them back and forth between the Fruit Auction, where there was no refrigeration, and plaintiff's premises. Levatino testified that there were some returns of chestnuts, although there were more completed sales than returns.

A second survey of the chestnuts was made on December 15, 1972 by Austin McCabe, Jr. for the plaintiff and Hansen for the defendant. According to McCabe, the warehouse records indicated that there were 217 bags in refrigeration on plaintiff's premises and 600 bags unrefrigerated at Phil Pepper's section of the Fruit Auction. McCabe found no reason to doubt these figures. As to the approximately 217 bags at plaintiff's premises, McCabe's report indicated that the temperature of the chestnuts was 60° F while the temperature of the refrigerator was 45° F. The report stated:

> "Stock is mature. Dull pale color. All nuts show light to heavy dehydration. Upon cutting: 30% to 70% average 40% shows internal decay and mold—early to well advanced stages. About 60% of nuts which show internal decay can be floated in water."

As to the approximately 600 bags at the Fruit Auction, McCabe noted that the air temperature was 48° F while the temperature of the chestnuts was 60° to 62° F. McCabe's report further stated:

> "Stock is dull pale color. Most to all nuts show light to heavy dehydration. Range: 5% to 70% average 30% shows internal decay and mold."

Hansen's report of the survey made on December 15, 1972 indicated:

"Pulp temperature of the chestnuts in both locations ranged from 60° to 62° F. The nuts examined were practically free from mold growth and sproutings, however, considerable dehydration and internal decay were found. We also noticed some worm/insect injuries present, estimated at approximately 1% to 2%.

"In order to determine the extent of internal decay, a 'floating test' was performed, the result of which showed an average of approximately 30% to 35% of the nuts to be so affected."

Levatino testified that even if chestnuts were in good condition upon discharge from the ATHINAI, there would be some deterioration over the period from November to January. McCabe testified that stored at 32° F chestnuts would last four to six months before decaying. However, McCabe also indicated that shuttling chestnuts back and forth in trucks to and from various places was not the optimum way to care for chestnuts and that a pulp temperature of 60° F was "unacceptable" and "[b]ad for chestnuts, if you want to hold them for a long length of time." (Transcript, at 199–200.)

On January 8, 1973, plaintiff sought to auction off four hundred 38-pound bags of chestnuts. According to Levatino's testimony, the lot of 400 bags was not sold at auction, and these bags, together with 77 others, were dumped after an inspection by a United States Department of Agriculture inspector indicated that 70 percent of the chestnuts were rancid and molded, with the remainder soft and spongy.

The Court has subject matter jurisdiction and jurisdiction over the parties.

At the close of trial, the Court found preliminarily that defendant was liable to plaintiff for the loss suffered by plaintiff as a result of the injury to the chestnuts on board the ATHINAI shown in Barkus' survey. This finding was based on the evidence showing that the chestnuts were delivered to defendant at Leghorn in apparent good order and condition, that the temperature in the No. 3 lower hold was not only generally above the temperatures indicated on the bill of lading, but on occasion rose above acceptable levels, and that upon discharge in New York, some of the bags were wet and some of the chestnuts moldy. Both sides were requested to make a computation of damages based on Barkus' survey. The question of defendant's liability for the deterioration of the chestnuts which occurred after discharge was left open.

■ Having now considered the evidence and the arguments of counsel, the Court finds no basis on which to hold defendant liable for the deterioration of the chestnuts which occurred after discharge from the ATHINAI. The evidence indicates that plaintiff's handling of the chestnuts after discharge contributed substantially, if not entirely, to the further deterioration of the chestnuts. The chestnuts were left unrefrigerated for large periods of time at the Fruit Auction and were shuttled back and forth between the Fruit Auction and plaintiff's premises. Even the temperature in plaintiff's refrigerator was maintained at a level unacceptable under the guidelines set forth by plaintiff's expert. Therefore, in accordance with its preliminary finding at the close of trial, the Court holds that defendant is liable only for the loss suffered by plaintiff as a result of the injury to the chestnuts shown in Barkus' survey.

The Court requested that counsel submit computations of damages on the basis of the injury to the chestnuts shown in Barkus' survey. Counsel for plaintiff has failed to do so and, instead, computed plaintiff's loss on the entire shipment.

■■ Ordinarily, "damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged." Weirton Steel Co. v. Isbrandtsen-Moller

Co., 126 F.2d 593, 594 (2d Cir. 1942); Interstate Steel Corp. v. S.S. "CRYSTAL GEM", 317 F.Supp. 112, 121 (S.D.N.Y. 1970). In any event, plaintiff is not entitled to recover more than its actual damages arising from the carrier's fault. 46 U.S.C. § 1304(5).

Plaintiff has introduced evidence as to the sound market value of chestnuts of size "$^{60}\!/\!_{65}$" and "$^{80}\!/\!_{85}$" in New York City on November 17, 1972. Taking a median, the sound market value of chestnuts on that date was $.52 per pound for size "$^{60}\!/\!_{65}$" and $.39 per pound for size "$^{80}\!/\!_{85}$." The only apparent evidence as to the market value of chestnuts size "$^{90}\!/\!_{95}$" is Levatino's testimony that chestnuts size "$^{60}\!/\!_{65}$" generally bring a higher price than the smaller sized chestnuts.

It appears that of the total of 161 bags of chestnuts size "$^{60}\!/\!_{65}$" originally shipped, 17 were lost in reconditioning and 144 were sold. Similarly, of the 643 bags of chestnuts size "$^{80}\!/\!_{85}$," 141 were lost in reconditioning, 195 were sold, and the remaining 307 were dumped. Finally, of the 170 bags of chestnuts size "$^{90}\!/\!_{95}$," it appears that all were dumped. Although plaintiff introduced evidence indicating that those chestnuts sold were sold at or below the market price on November 17, 1972, there is little or no evidence indicating when or to whom each sale was made. It would therefore be impossible for the Court to determine whether the loss occasioned by the difference between the sale price and sound market value resulted from the injury to the chestnuts indicated in Barkus' survey or later deterioration for which defendant is not liable.

■ In view of the evidence presented, the Court finds that the only reasonable basis on which to arrive at plaintiff's damages in accordance with the Court's finding on liability is to allow plaintiff the sound market value of the chestnuts lost in reconditioning on or about November 21, 1972, plus the cost of reconditioning. This amounts to:

| | | | |
|---|---|---|---|
| 17 × 55 × $.52 | = | $ | 486.20 |
| 141 × 55 × .39 | = | | 3,024.45 |
| Cost of reconditioning | = | | 1,461.00 |
| | | | $4,971.65 |

Plaintiff is entitled to judgment against the defendant in the amount of $4,971.65, plus interest to be computed from November 17, 1972 at the rate of 6 percent per annum.

The foregoing constitutes the Court's findings of fact and conclusions of law. F.R.Civ.P. 52(a).

Settle judgment on notice.