**FERRO UNION, INC., Plaintiff,**

v.

**M/V TAMAMONTA, her engines, tackle, boilers, etc. in rem; and against Lykes Lines Limited, LLC, Tamahine Shipping Hong Kong Ltd., Tamapatcharee Shipping Ltd., Tamahine Investments Ltd. and V. Ships (U.K.) Ltd. in personas, Defendants.**

No. 02 CIV.2010(VM).

United States District Court, S.D. New York.

May 7, 2004.

John T. Lillis, Jr., Matthew Todd Loesberg, Kennedy Lillis Schmidt & English, New York City, for Plaintiff.

Christopher H. Mansuy, DeOrchis & Partners, L.L.P., New York City, for Defendants.

*DECISION AND ORDER*

MARRERO, District Judge.

Primarily at issue in these cross-motions for summary judgment is whether a consignee of goods can recover damages against a carrier responsible for damaging the goods, where the consignee's only measure of damages is its insurance award. Because the Second Circuit has already answered this question in the negative, the Court grants the defendants' motion for summary judgment and dismisses the case.

## I. BACKGROUND [1]

In October 2000, plaintiff Ferro Union, Inc. ("Ferro Union"), a Houston company, purchased over 2,000 metric tons of steel pipes from a manufacturer in China for a price of over $1 million. Ferro Union designated delivery to its affiliate in Puerto Rico, MacSteel Service Centers USA ("MacSteel"). Ferro Union alleges that the pipes departed China with a clean bill of lading (indicating no damage) but arrived in Puerto Rico with rust damage.

Ferro Union's insurance company, Tokio Marine & Fire Insurance Company, Ltd. ("Tokio"), hired a surveyor, Terence Noodle ("Noodle"), to estimate the damage. Noodle concluded that the pipes were rusted, likely from contact with seawater. Noodle requested that MacSteel segregate the good pipes from the damaged pipes, so that he could determine the full extent of the rust damage. MacSteel's product manager, Michael Davis ("Davis"), agreed. At some point later, Davis changed his mind,

---

1. The facts derive from (1) the complaint; (2) the declaration of Captain Terence Noodle, dated March 11, 2004 ("Noodle Decl."); (3) the declaration of Leonard Maltese, dated March 11, 2004; (4) the affidavits of Matthew T. Loesberg, dated March 12, 2004, and April 30, 2004; (5) the declaration of Michael S. Davis, dated March 11, 2004; (6) the declara-
tions of Christopher H. Mansuy, dated December 22, 2003, and April 14, 2004; and (7) the declaration of Patrick L. Jones, dated April 6, 2004, as well as the exhibits attached to those documents. Except where necessary, the Court will not cite these sources further.

and told Noodle that it would be too expensive to segregate the pipes.

Before Noodle's final report, Davis sought from Tokio an insurance award representing at least 35 percent depreciation in the value of the pipes. Noodle told Tokio—apparently based upon Noodle's mere preliminary observations—that Davis's figure was too high. Tokio ultimately agreed to pay Ferro Union an award representing a 25 percent depreciation in the value of the pipes, in exchange for being subrogated to Ferro Union's rights in connection with the loss.[2] Noodle's final report states that the devaluation should not have exceeded 20 percent.

MacSteel integrated this particular shipment of pipes, including the damaged pipes, with its regular inventory of pipes from other suppliers. MacSteel resells pipes as is; it does not process the pipes in any way. MacSteel has no invoices or other records to show whether, or to what extent, the damaged pipes were sold at a discount.

Ferro Union seeks damages in an amount representing its insurance proceeds, or, in the alternative, 20 percent devaluation (Noodle's estimate) plus the survey fees. Defendants Tamahina Investments, Ltd., the vessel owner, V. Ships, Ltd., the vessel operator, and Lykes Lines Limited, LLC, the carrier, (collectively, "Defendants") respond that Ferro Union has not established a measure of damages with reasonable certainty. Both sides move for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.,* "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

Where the moving party would bear the burden of persuasion at trial, that party must first make a *prima facie* case by "support[ing] its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party would bear the burden of persuasion at trial, the moving party can make its *prima facie* case by either "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrat[ing] to the Court that the nonmoving party's evidence is insufficient to establish an essential element" of the claim. *Id.*

After such a *prima facie* showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some

<hr>

**2.** According to Ferro Union, Tokio is the real party in interest to this litigation. Because it is proper for Ferro Union to bring the lawsuit

in its own name in such a circumstance, *see* Fed.R.Civ.P. 17, the Court will continue to refer to Ferro Union as the proper plaintiff.

hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

### III. *DISCUSSION*

■ The parties agree that this case is governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* ("COGSA"). The general measure of damages against a carrier under COGSA "is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive." *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir.1987). "In no event shall the carrier be liable for more than the amount of damage actually sustained." 46 U.S.C. § 1304(5).

■ Defendants contend that Ferro Union's asserted measure of damages—its insurance proceeds—is insufficient proof of its actual loss. Defendants rely principally upon *Weirton Steel Co. v. Isbrandtsen–Moller Co.*, 126 F.2d 593 (2d Cir.1942).

In *Weirton Steel*, over 40 percent of a shipment of tin was damaged on a voyage from Baltimore to Hong Kong. The consignee, the Texas Company, accepted the damaged goods only after its insurance company agreed to pay about $10,000 to cover the damage. The Texas Company then reconditioned the plates (at a cost of about $1,000), fashioned them into five-gallon oil cans, and sold them full of oil. Although "the reconditioning left the plates dull and imperfect," the Texas Company did not put forth any evidence to suggest that it ultimately sold the oil cans at anything below market price. Just as here, the insurance company was the real party in interest as it sought to recover the full amount of insurance proceeds paid to its insured, the consignee.[3]

The *Weirton Steel* panel concluded that the plaintiff could recover only the reconditioning costs because it otherwise had proved no actual loss:

> [T]he [plaintiff] proved nothing about the Texas Company's sales except that it would have been impracticable to keep separate accounts for the damaged cans and the undamaged. That we should not insist upon if it had appeared for example that any discount whatever had been claimed and allowed upon the whole parcel and what that discount was. But, considering the fact that 43% of all the five gallon cans sold at Hong Kong were made out of reconditioned plate, certainly it was not unreasonable to ask that the [plaintiff]—which has the burden of proof and certainly had better access to the evidence—should show that the Texas Company had been obliged to make an allowance of some kind.

*Id.* at 594. The Court also rejected the notion that the insurance company payment represented compensable damages:

---

**3.** In *Weirton Steel*, the nominal plaintiff was the shipper, whereas in this case, the nominal plaintiff is the purchaser, Ferro Union.

"The fact that the underwriter agreed to pay the full amount claimed by the Texas Company is not material; for all we know, he may have thought it worth while to keep the good-will of an important customer." *Id.* at 595.

The last-quoted portion of *Weirton Steel* squarely holds that an injured plaintiff's insurance proceeds, without more, cannot form the basis of an award of cargo damages against a common carrier. This Court is bound by that holding of *Weirton Steel*, and its facts are materially identical to the facts of this case.

Ferro Union cites four cases in its attempt to limit the holding of *Weirton Steel*, but the Court finds that those cases are consistent with *Weirton Steel* and not applicable to the facts here. First, in *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57 (2d Cir.1985), most of a shipment of steel pipe was damaged by rust in transit from Korea to Puerto Rico. Just as here (and in *Weirton Steel*), the real party in interest was the consignee's insurer, who had reimbursed the consignee for an estimate of the loss. The consignee produced invoices reflecting that it passed along the insurance company's loss estimate to its ultimate customers, who purchased the goods at a discount. The defendants took issue with the fact that the district court awarded the plaintiff its full demand, even though the consignee was unable to produce invoices corresponding to 49 of the 409 bundles in the shipment. The *Fortune Star* panel upheld the district court's full award because it concluded that it was not clearly erroneous to rely upon evidence pertaining to a "substantial portion" of the consignee's resales as an estimate of the total losses. *Id.* at 62.

*Fortune Star* is distinguishable because, in this case, Ferro Union has not produced *any* invoices which would reflect the fact that it actually sold any steel pipes at a discount. As in *Fortune Star*, the Court

here would likely be willing to indulge Ferro Union in some assumptions to compensate for incomplete or representative evidence. The Court cannot, however, indulge in speculation about the market value or resale price of the damaged goods, absent *any* meaningful evidence in that regard.

Second, in *Cook Indus., Inc. v. Barge UM–308*, 622 F.2d 851 (5th Cir. July 1980), the plaintiff's shipment of soybeans was damaged in transit from Oklahoma to Louisiana, resulting in the soybeans being downgraded to "sample grade." *Id.* The plaintiff ultimately blended the sample grade soybeans with much larger quantities of higher grade soybeans, and sold them at the original market price for higher grade soybeans. The Fifth Circuit panel, distinguishing *Weirton Steel*, noted that the plaintiff *had* suffered compensable damages (beyond the blending costs) because, "if the [plaintiff] had wanted to blend bad beans with good, he could have purchased sample grade beans directly" at a lower price. *Id.* at 855. In other words, because there was a discernable (and cheaper) market for sample grade soybeans, the plaintiff suffered the loss in paying a higher price for what ended up being lower grade soybeans. *See id.* ("The award of blending costs alone, if such were awarded, would not compensate the shipper for the potential savings, *i.e.*, the loss realized by [plaintiff] in using its [higher grade] beans as sample grade."). *Cook* is distinguishable because, here, Ferro Union has not quoted a discernable market price for rusted steel pipes, much less provided a reasonably ascertainable estimate of the portion of the shipment which was actually rusted.

Finally, *Macsteel Int'l USA Corp., v. M/V IBN ABDOUN*, 218 F.Supp.2d 480, 484 (S.D.N.Y.2002) and *Thyssen, Inc. v. S/S EUROUNITY*, No. 89 Civ. 8477, 1993

WL 158511, at *5–*6 (S.D.N.Y. May 13, 1993), are easily distinguishable from the facts here because, in those cases, the consignee of the damaged goods was awarded damages corresponding to a price at which it *actually sold* the damaged goods to a customer or customers.

Each of these four cases support the proposition that, under the ordinary damages formulation, the market price of the goods as damaged may be measured by either the actual sale price of the damaged goods, or by a discernable market price for those goods as damaged.[4] More importantly, none of those cases calls into question the holding of *Weirton Steel* that an insurance payout, without more, is not a suitable substitute for the ordinary "market value" rule as a measure of actual losses. Although the *Weirton Steel* panel did not explain the reasons compelling its rule with much detail, such a rule is eminently sensible. If an insurance payout could substitute for more accurate measures of actual damages, insurance companies would have less incentive to devote resources towards obtaining more accurate measures of the actual losses of their insureds, especially in cases where there is an easily identifiable liable party. Defendants would be forced to rebut the insurance payout measure by producing evidence as to the actual loss—evidence which is typically more accessible to the injured plaintiff—thereby shifting the burden of proof on an essential element of plaintiff's case, the measure of damages. *Cf. Weirton Steel*, 126 F.2d at 594 (noting that the plaintiff "has the burden of proof and certainly had better access to the evidence").

Ferro Union seeks, in the alternative, damages based upon a 20 percent devaluation of the steel pipes. As with any other measure of contract damages, under COGSA, a Court can award damages for defective cargo only where the injured plaintiff can establish those damages "with reasonable certainty." Restatement (Second) of Contracts § 352 (1981); *see also M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir.1985) ("The damage rule in admiralty cases generally does not differ from ordinary contract rules."). The Court concludes that Ferro Union's alternative measure of damages is too conjectural to be recoverable.

Noodle's report merely states that Tokio's devaluation allowance to Ferrio Union "should not have exceeded 20%"—*i.e.*, it does not even purport to set forth a definite figure of the actual loss. (Noodle Decl. Ex. 3, at 7) The report gives no explanation at all as to how Noodle arrived at that figure, in any event. The narrative of the report suggests that Noodle's estimate was, at best, an earnest conjecture. Noodle's report focuses on the *nature* of the damage (rust damage from contact with sea water), rather than the *extent* of the damage, because Noodle assumed that MacSteel would segregate the damaged pipes from the good pipes. MacSteel ultimately rejected that option as too costly, and as a result, there is nothing in Noodle's report (or anywhere else in the record) to indicate whether the damage affected a large or small portion of the cargo. For instance, Davis apparently thought that up to half the pipes were affected and initially wanted at least 35 percent devaluation from Tokio. That

---

4. To be sure, the " 'test of market value is at best but a convenient means of getting at the loss suffered,' " and it " 'may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable.' " *Kanematsu–Gosho Ltd.*, 814 F.2d at 118 (quoting *Illinois Central Railroad v. Crail*, 281 U.S. 57, 64–65, 50 S.Ct. 180, 74 L.Ed. 699 (1930)).

estimate is in sharp contrast to Noodle's estimate of up to a 20 percent devaluation. This variance bolsters the Court's conclusion that the estimates—which pertained to a shipment of over 50,000 pipes—were raw guesswork. Such guesswork is exactly the type of speculation which will not defeat a motion for summary judgment. *See* Fed.R.Civ.P. 56(e) (requiring "specific facts"); *see also D'Amico,* 132 F.3d at 149 (holding that "hard evidence," not "speculation," is required to counter a moving party's *prima facie* case for summary judgment).

The Court recognizes that it might have been impractical to determine the damages with mathematical precision, but the law does not require such a showing. *See, e.g., American Federal Group, Ltd. v. Rothenberg,* 136 F.3d 897, 907–08 (2d Cir.1998). Even recognizing the perhaps prohibitively expensive issue of segregating the steel pipes, Ferro Union failed to even show "that any discount whatever had been claimed and allowed upon the whole parcel and what that discount was." *Weirton Steel,* 126 F.2d at 594. As far as the Court can discern, Ferro Union may have sold all of the steel at the same prices as it would have sold the steel in absence of the rust. *Cf. id.* (stating that it is "not unreasonable" to ask a plaintiff, "which has the burden of proof and certainly had better access to the evidence," to show that it was "obliged to make an allowance of some kind" because of the damaged goods). The Court emphasizes that apparently neither Mac-Steel, nor Ferro Union, nor Tokio attempted to discern the damages with *any* measure of precision; hence, no recovery is available.

## IV. *ORDER*

For the reasons stated, it is hereby

**ORDERED** that the motion of plaintiff Ferro Union, Inc., for summary judgment is denied; it is further

**ORDERED** that the motion of defendants Tamahina Investments, Ltd., V. Ships, Ltd., and Lykes Lines Limited, LLC, for summary judgment is granted, and the Clerk of Court is directed to enter judgment on their behalf and dismiss this case.

The Clerk of Court is directed to close this case.

**SO ORDERED.**